**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MONTGOMERY COUNTY** | : | |
| **INTERMEDIATE UNIT NO. 23** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 20-1134** |
| | : | |
| **A.F.** | : | |
| ***BY AND THROUGH HIS PARENTS*** | : | |
| ***D.F. AND J.F.***, **ET AL.** | : | |

McHUGH, J.                                                          DECEMBER 9, 2020

## MEMORANDUM

The Individuals with Disabilities Education Act (IDEA) establishes a right to a free and appropriate public education, commonly referred to as FAPE. A key part of that guarantee is that the process followed by school districts must ensure that parents are meaningfully involved in the decision-making process and the creation of their child's individualized education program ("IEP"). If that right of meaningful participation is denied, and the effect of such denial is to undermine the parents' informed decision-making, it can in some instances constitute a denial of FAPE.

In this case, a state Hearing Officer determined that the manner in which the Montgomery County Intermediate Unit No. 23 ("MCIU") conducted that process significantly impeded the parents' participation. She ordered the MCIU to provide the student's parents with tuition reimbursement for the 2018-19 school year to pay for their child's enrollment in a private school. The MCIU now appeals, alleging deficiencies in both the Hearing Officer's factual and legal analysis. The parents have cross-appealed, contending that the Hearing Officer erred by finding the program offered by the MCIU would have been substantively appropriate, had it been adequately communicated. After reviewing a voluminous record, I agree with the Hearing

Officer that the MCIU significantly impeded the Defendant parents' participation in the decision-making process regarding the development of their son's education.  But I disagree with her conclusion that the program was substantively adequate.  Because either violation supports the remedy awarded, I affirm the Hearing Officer's order of tuition reimbursement for the 2018-2019 school year.

## I.      Factual and Procedural Background

As is typical in IDEA cases, the factual record must be reviewed in detail.  A.F. ("child") is a five-year old disabled student who resides within the Montgomery County School District. Defs.' Mot. for Summ. J. 1, ECF No. 17; N.T. 27, ECF No. 10; Hearing Officer ("HO") Op. 1, ECF No. 10.  At all relevant times for the purposes of this litigation, he was two and three years old. N.T. 39, 211, 344.  He became eligible for special education services under the IDEA by virtue of a classification of autism. S17 at 24-25, ECF No. 10; HO Op. ¶ 1; HO Op. ¶ 28. Plaintiff, MCIU, is a Pennsylvania Intermediate Unit and holder of a mutually agreed-upon written arrangement with the Commonwealth of Pennsylvania to provide early intervention services for students with disabilities over the age of three through the age of beginners in Montgomery County pursuant to the Early Intervention Services System Act. 11 P.S. § 875-101 *et seq*; Compl. ¶ 4.

A.F. exhibited developmental delays early in life. N.T. 202-06, 215; P-3, ECF No. 10-3; S-3, ECF No. 10; HO Op. ¶ 2.  His communication skills were very limited compared to same-age children. N.T. 202-06, 215; P-3; S-3; HO Op. ¶ 2.  For example, approximately four months before his third birthday, he had "vocalizations but no speech." S17 at 18, ECF No. 10.  To address these delays, his parents ("Parents") enrolled him in both early intervention services via an infant/toddler program and private services. N.T. 149, 203, 233, 241-43; P5; HO Op. ¶¶ 5-6.

He was identified as having autism in the fall of 2017 at the Children's Hospital of Pennsylvania ("CHOP"). HO Op. ¶ 7; N.T. 208-211.  CHOP recommended that he receive programming focused in Applied Behavioral Analysis ("ABA")[1] and recommended a number of private programs where A.F. could receive those services, including A Step Up Academy ("Private School"), where he ultimately enrolled for the 2018-2019 school year. N.T. 255-57; S-3; S-18, ECF No. 10; HO Op. ¶ 8.

A. Initial Evaluation of A.F. by the MCIU

This placement at the Private School was not a foregone conclusion.  Parents explored a number of options, including the program offered by the MCIU. N.T. 216, 218, 255-60; HO Op. ¶¶ 18-44.  At Parents' request, MCIU conducted an initial evaluation in February 2018, which included a Functional Behavior Assessment ("FBA"); S-14, ECF No. 10; S-17; N.T. 146, 218-21; HO Op. ¶¶ 18, 26.  The results of the evaluation reflected, among other things,  significant delay in the areas of attention and memory, as well as in perception and concepts, and mild delay in the areas of reasoning and academic skills. S17 at 10; HO Op. ¶ 21.  It also reflected significant delay in language skills. S17 at 11.  It further reflected child's needs with regard to

---

[1] Applied Behavioral Analysis is a recognized approach to addressing the behavioral challenges of autism. It has been described as "a science devoted to the understanding and improvement of human behavior. The title, ABA, is significant. The word 'applied' indicates that ABA is designed to bring about changes in socially significant behavior that will improve a person's daily life in terms of social interaction, self-care, vocation, and recreational activities. The word 'behavior' requires that the behavior analyst precisely define a particular behavior and accurately measure changes in that behavior. Finally, the word 'analysis' requires the behavior analyst to determine that there is a causal relationship between any intervention chosen and changes in behavior." Elizabeth A. Shaver, *Should States Ban the Use of Non-Positive Interventions in Special Education? Reexamining Positive Behavior Supports Under Idea*, 44 STETSON L. REV. 147, 150–51 (2014).

Moreover, ABA "encompasses a variety of programming approaches that are based on its principles." HO Op. ¶ 9.  N.T. 595- 97, 627, 653, 655, 702-03, 972-73. According to MCIU witness and BCBA Sean Romano, ABA is "an umbrella term. It's the discipline of actually applying behavior analytic principles to your daily life. So that can look many different ways, but the core of it should be antecedent and consequence manipulations to change behavior." NT 595; Pl.'s Mot. for Summ. J. 4, ECF No. 18-2.

"pre-requisite learning skills" like imitation and visual attention. S17 at 16-17; HO Op. ¶¶ 3, 25, 27.  The evaluation incorporated Parents' priority of addressing child's communication deficits. N.T. 215; S-17 at 5-6, 12; HO Op. ¶ 20.[2]

      B. <u>Initial April 2018 IEP Offered by the MCIU</u>

      The MCIU next developed a draft IEP in April 2018. HO Op. ¶ 29-33.  The IEP addressed a number of areas, including the child's needs and related goals, the services to be performed to achieve those goals, and placement. S20, ECF No. 10, 10-1; HO Op. ¶¶ 31-33. Services included Physical, Occupational, and Speech/language Therapy (for thirty to forty-five minutes each week), Specialized Instruction (for forty-five minutes each week), and notably, Behavior Support (for ninety minutes each week).[3] S20 at 33; HO Op. ¶ 33.  The placement would be at an educational site location outside of the home as opposed to a classroom.[4] S-20 at 35; S-21 at 2; HO Op. ¶ 33.  The IEP specifically proposed the involvement of a Behavioral Specialist Consultant ("BSC") who, in tandem with a Special Education Teacher, would assist the child with achieving goals related to "eye contact and joint attention," as well as with

---

[2] Parents argue that this evaluation was insufficient to establish a proper baseline for A.F.'s needs due to the MCIU's use of the Battelle Developmental Inventory – Second Edition (BDI-2) to test A.F., as opposed to the Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP). Defs.' Mot. for J. on the Admin. R. 28-33, ECF No. 17-1. They further argue that the lack of a proper baseline prevented the MCIU from developing a substantively appropriate IEP. *Id.*  The Hearing Officer ultimately disagreed. HO Op. 24-26. As will be explained, the IEP was substantively inappropriate, but not on the grounds of a deficient evaluation.

[3] Each unit of dedicated time referenced within the IEP stands for 15 minutes. N.T. 673-74.

[4] The MCIU characterized the placement as "Itinerant Services Outside the Home." S21.

"imitation[5] and turn taking."[6]  S20 at 23-24.  The BSC, working in tandem with a special instructor, would also assist A.F. with attending to and completing "adult chosen" activities by measuring his progress and documenting the amount of time that he stayed on each activity. S20 at 28.

An IEP meeting occurred by telephone in April 2018. N.T. 222-224; HO Op. ¶ 34.  On the call were Parents and representatives from the MCIU. *Id.*  Although a behavioral specialist and related service providers were invited to attend, Parents signed a form provided by the MCIU excusing them from the meeting. N.T. 223; S-19 at 3-4, ECF No. 10; HO Op. ¶ 34. Subsequently, Parents did not approve MCIU's Notice of Recommended Educational Placement ("NOREP"),[7] stating that A.F. "needs a highly structured classroom setting with intensive behavioral services, using applied behavior analysis.  He also requires a higher level of speech and OT than what was offered, and those services should be a coordinated effort between therapists and the school." S21 at 3, ECF No. 10-1; HO Op. ¶ 35.

---

[5] MCIU witnesses and BCBAs Jacqueline Santolupo and Sean Romano testified as to the use of imitation in the verbal behavior teaching approach used by the MCIU. N.T. 830-833. "[V]erbal behavior is a specific style of [ABA] programming that comes from [B.F.] Skinner's analysis of verbal behavior, [from] which Mark Sundberg created the VB-MAPP." N.T. 595. "What verbal behavior looks at is really breaking down those different components of language into their simplest form, and then teaching the developmental progress we would see from any neurotypical individuals." N.T. 832.

[6] Behavioral Specialist Consultants ("BSCs") and Board-Certified Behavioral Analysts ("BCBAs") are experts in ABA/verbal behavior. MCIU witnesses testified that these specialists train other staff in ABA methods, observe MCIU's classroom to ensure competency, administer the bi-annual VB-MAPP tests to students, and assist with modifying programming based on the results of such tests. NT 302, 476-77, 481, 483, 512, 814, 821-822.

[7] In Pennsylvania, the NOREP satisfies the procedural requirement under the IDEA that a local educational agency ("LEA") must give written prior notice to the parents when it proposes to initiate or change the educational program or placement of the child. *See* 34 C.F.R. 300.503; Defs.' Mot. for Summ. J. 13. An LEA is "a public board of education or other public authority legally constituted within a State for either administrative control or direction of . . . public elementary schools or secondary schools . . . ." 20 U.S.C. § 1401(19).

C. <u>Revised May 2018 IEP Offered by the MCIU</u>

In response, the MCIU revised the IEP in May 2018. HO Op. ¶ 36.  On its face it appeared to provide far less support from the standpoint of behavioral services. S23.  Under the revised IEP, the child would attend an autism support classroom at Thomas Fitzwater Elementary School for roughly twelve hours per week, with stepped up levels of speech and occupational therapy relative to the initial April IEP proposal. N.T. 123-24, 515, 554, 622; S-23; HO Op. ¶ 36.  Significantly, explicit reference to dedicated Behavior Support, which had previously been dosed at 90 minutes/week, was removed entirely. HO Op. ¶¶ 33, 36.  Of equal importance, the new IEP omitted the previous reference to the involvement of a behavioral specialist. S23, ECF No. 10-1.[8]  For example, the BSC who had been tasked with helping A.F. reach his goals in "eye contact and joint attention," "imitation and turntaking," and participation in "adult chosen" activities no longer appeared. S23 at 23-24, 28.[9] As noted below, behavioral services were of grave concern to A.F.'s Parents.

A.F.'s mother visited the proposed classroom in early May 2018. N.T. 236, 265-66; S-43 at 16, ECF No. 10-2; HO Op. ¶ 39.  After the tour, she emailed the classroom's special education teacher, Pamela Nemitz, to inquire about the degrees and certifications of the professionals in the room. P1-1; N.T. 817-18.  She specifically asked about the presence of staff with master's

---

[8] According to MCIU BCBA Sean Romano, "it's not specifically listed, to my knowledge because it's built into every autism support classroom," where "there's a behavioral analyst on site working with the teachers and students." N.T. 688, 690.

[9] Neither IEP used the term "ABA." S20; S23. Although BCBA Sean Romano did not write A.F.'s IEP, he testified that when he does, he writes IEPs for typical parents, who can become confused or react negatively to behavior terminology. N.T. 623-625. For that reason, he uses everyday language, N.T. 624, as opposed to technical language relating to behavioral analysis, such as VB-MAPP, verbal behavior, or ABA.  Although the Hearing Officer found credible Romano's testimony that the strategies utilized in the classroom are "seeped" [sic] with ABA and verbal behavior principles, and that those principles are used consistently across all settings, N.T. 702-703, she also found that the Parents lacked this critical understanding, and through no fault of their own. HO Op. 26.

degrees and training in ABA.  The only faculty members with ABA training that Ms. Nemitz

mentioned were personal care assistants ("PCAs"). P1 at 1, ECF No. 10-3.  She did not mention

the involvement or oversight of a single BSC or BCBA, despite the fact that "there's . . . a

BCBA on the [MCIU] team and then there's always at least one other consultant" whose

"minimum qualifications would be that they completed their masters [sic] and ABA coursework

and that they're licensed in the State of Pennsylvania." N.T. 822; *Id.*; HO Op. ¶ 36.[10]

A.F.'s Parents disapproved the NOREP in mid-May 2018. HO Op. ¶ 40; S24, ECF No.

10-1.  Their written disapproval of May 2018 explained that they wanted to discuss an alternative

placement, which provided services that the MCIU classroom did not provide, including a

structured environment, an increase in overall hours, more individual related and intensive ABA

services and opportunities for inclusion. S24 at 3; HO Op. ¶ 40.  They requested another meeting

with the MCIU. S24 at 3.

That meeting occurred by way of a May 30, 2018 teleconference, in which the behavior

specialist and other related specialists were, once again, absent.[11] N.T. 163; HO Op. ¶ 38.

Although A.F.'s mother recalls MCIU staff "mention[ing] ABA classroom"—N.T. 231; HO Op.

26, she has no recollection of an explanation as to whether a behavioral specialist would be

supervising her child's education. N.T. 231.  She also recalls that there was no mention of early

---

[10] BCBA Romano's testimony that in fact "all of the autism classrooms have a BCBA working in them" does not directly address the fact that Parents were mistakenly told only personal care assistants had ABA training.  N.T. 688; P1-1.  Nor does it really address Parents' concern triggered by the disappearance of a dedicated behavioral specialist and ninety minutes/week of "Behavior Support" from the revised IEP's. S20; S23.

[11] This was not an IEP meeting withing the meaning of the IDEA. NT 164-65. Thus, consent for such absence was not statutorily required.

intensive behavioral intervention.[12] N.T. 231.  As summarized by the Hearing Officer, "the IU did not explain how Child's programming would be individualized for Child, would address Child's significant language deficits, or would be based on ABA principles." HO Op. ¶ 38; N.T. 161-164, 231-234.  Once more, the MCIU issued a NOREP on June 5, 2018 for the revised May 2018 IEP, summarily stating that "the MCIU continues to recommend the MCIU ABA Classroom."  S25 at 2, ECF No. 10-1; HO Op. ¶ 41.  Parents did not respond. S25; HO Op. ¶ 41.

A psychologist working with the child sent Parents a letter in July 2018 supporting the use of ABA services for A.F., which to date had "enabled him to become more receptive to the world around him and engage more successfully with his other therapists." S27, ECF No. 10-1; HO Op. ¶ 40. The letter recommended individualized instruction and a classroom that was "ABA oriented," and specifically cautioned against a dilution of the services A.F. was already receiving via early intervention services ("EIS"). S27; HO Op. ¶ 40.  Parents forwarded the letter to the MCIU. N.T. 188, 240.

D. Revised August 2018 IEP Offered by the MCIU

Parents then requested another IEP meeting, which was scheduled for late July/early August 2018. N.T. 165-66, 169, 239, 243-44; S-29; S-30; S-32; HO Op. ¶ 42.  Again, the behavioral specialist and related service providers did not attend. S-29, ECF No. 10-1; S-30, ECF No. 10-1, 10-2; S-32, ECF No. 10-2; HO Op. ¶ 42.  At the meeting, Parents requested that the services be discussed. N.T. 166-67.  Yet, the revised August IEP prepared by the MCIU remained, in all relevant ways, identical to the revised May 2018 IEP, and references to dedicated behavioral support and behavioral specialists were again omitted from the plan. HO

---

[12] BCBA and MCIU witness Sean Romano describes EIBI as "behavioral principles that are applied intensely with a young population," N.T. 665, and describes the MCIU classroom as an "intensive behavioral program." N.T. 664.

Op. ¶ 42. S30 at 23-24, 27-28, 33.  Program administrator Lorinda Moyer testified that the revised IEPs did not specifically reference ABA principles, but that the classroom where A.F. would be placed was its ABA classroom. N.T. 123-125. Nonetheless, she agreed that "the services themselves changed." N.T. 125.  Yet no witness from the MCIU gave specific testimony as to how these critical changes were explained to Parents or gave testimony as to how Parents' concerns were directly addressed in any of the discussions held.  The MCIU appeared to place substantial weight on the fact that Parents were able to tour the classroom. N.T. 124-25; Pl.'s Mot. for Summ. J. 8-9, ECF No. 18.

Parents describe MCIU's attitude during this process as "very . . . matter of fact, just like you know, very business oriented, here's the permission, sign the permission." N.T. 219.  This description is consistent with the tone of internal emails sent within the MCIU prior to the August 2018 meeting with the parents, in which Moyer instructed intake case manager Beverly Beck: "[y]ou should send an invite but do not need to do any updates to the IEP. We will just listen to what parent says." P25 at 4, ECF No. 10-5.  This was true even though the MCIU understood that the parents were particularly concerned with the specific services their child would be receiving. N.T. 127, 166-167.  Moyer admits that the parents' "conversation always went right to services," whereas Moyer "kept trying to prompt to go back to the goals and the needs . . . ." N.T. 128.

At the August meeting, the parents asked that A.F. be placed at the Private School. P1 at 4-5; HO Op. ¶ 42.  After rejecting the final NOREP in September, they reiterated to the MCIU their intention to seek tuition reimbursement. S34 at 3, ECF No. 10-2; HO Op. ¶ 44.[13]  Finally,

---

[13] The follow up NOREP letter from September 2018 again states that "the MCIU continues to recommend the MCIU ABA Classroom." S25. Similarly, an August 7, 2018 email sent by Plaintiff after their final refusal to update the IEP, states that "[w]e continue to offer our ABA Classroom for" A.F. P1-5.

9

Parents challenged the appropriateness of the education that the MCIU had offered their son and filed a due process complaint on May 6, 2019, ODR File No. 22185-1819AS. HO-2 at 1, ECF No. 10.

E. The Due Process Hearing

A four-day hearing followed, in which the Hearing Officer found the MCIU's program to be substantively appropriate for A.F.'s needs. HO Op. 25-26.  She found the MCIU classroom to be a highly structured environment that would have been based on ABA principles. HO Op. ¶ ¶ 45, 48.  It was overseen by behavioral specialists, included bi-annual assessments using Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP), employed both individual instruction and work in pairs, and utilized reinforcements based on the preferences of each individual child. HO Op. ¶¶ 45, 47, 49.

Nonetheless, the Hearing Officer ultimately concluded that "[p]arents did not grasp a full understanding of the IU's proposal, and through no fault of their own." HO Op. 26.  They had "made clear their interest, and even insistence, on programming with intensive ABA support. Yet, the only behavioral support that was set forth in the IU's initial IEP was removed when the revisions were made." *Id.*  Moreover, "[t]he IU did not explain how Child's programming would be individualized for Child, would address Child's significant language deficits, or would be based on ABA principles." HO Op. ¶ 38.  The Hearing Officer maintained that "the mere reference to ABA in passing, as occurred in this case, falls far short of adequately describing the program and allaying Parents' concerns with what appeared to be a plan with no BCBA support and little if any intensive ABA-driven services." *Id.*  These findings resulted in a December 15, 2019 Order awarding tuition reimbursement to the parents, which is the subject of this appeal.

**II.    Standard of Review for IDEA Claims**

District courts apply a "modified *de novo* standard of review" when considering an appeal from a state agency's decision under the IDEA.[14] *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (internal quotation marks and citation omitted).  Courts cannot "impos[e] their own view of preferable educational methods on the states," and therefore must give "due weight" to the findings in the administrative proceeding (also known as a "due process hearing" in IDEA parlance). *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  "Due weight" means that "[f]actual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *Id.* (internal quotation marks and citation omitted).  And I must accept the Hearing Officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (internal citations omitted).  "With regard to conclusions of law, the review is plenary." *Rose Tree Media Sch. Dist. v. M.J. by & through M.J.*, No. 18-CV-1063, 2019 WL 1062487, at *3 (E.D. Pa. Mar. 6, 2019).  "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012) (citation omitted).  Significantly, the Court of Appeals has held that, in reviewing IDEA appeals, district

---

[14] "Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issues of material fact.'" *D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764, 769 (D.N.J. 2010), *aff'd sub nom. D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564 (3d Cir. 2012) (citing *L.B. v. Nebo Sch. Dist.,* 379 F.3d 966, 974 (10th Cir.2004)).  It is clear that from the titles of the parties' motions that they are effectively seeking "a judgment on the administrative agency's record." *Id.* (quoting L.B., 379 F.3d at 974).  "Although seeking judicial review of an administrative agency's decision by way of a summary judgment motion 'is permissible under the IDEA, it is not a true summary judgment procedure. Instead, the district court essentially conduct[s] a bench trial based on a stipulated record.'" *Id.* (citing *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1472 (9th Cir.1993)).

courts "must decide independently whether the requirements of the IDEA are met." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (internal quotation marks and citation omitted).

### III.   Relevant Legal Principles for IDEA Claims

#### A.   Free and Appropriate Public Education ("FAPE") under the IDEA and the Role of the IEP

"The IDEA requires states receiving federal education funding to provide every disabled child with a [FAPE]." *M.R.*, 680 F.3d at 268.  A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 189 (1982)).  "The IDEA contemplates that school districts will achieve these goals by designing and administering a program of individualized instruction for each special education student set forth in an Individualized Education Plan ("IEP")." *D.S.*, 602 F.3d at 557.  Thus, at the heart of every FAPE lies the IEP.  *Endrew F. v. Douglas Cnty. Sch. Dist*. RE-1, 137 S. Ct. 988, 999 (2017) (citing *Honig v. Doe*, 484 U.S. 30, 311(1988)).  The IEP "consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *D.S.*, 602 F.3d at 557; *see* 20 U.S.C. § 1414(d)(1)(A).[15]

#### B.   Parent Participation in the Development of the IEP

The IDEA sets up a host of procedures for ensuring not only that every child who qualifies under the IDEA receives a FAPE but that the child's parents play a significant role in

---

[15] Particularly relevant to the instant matter is the requirement that the IEP include "a statement of the special education and related services . . . to be provided to the child. 20 U.S.C. § 1414(d)(1)(A)(IV).

the development of their child's education. *See* 20 U.S.C. § 1414(e);[16] 34 C.F.R. § 300.501(b).[17]

Necessarily, parents or guardians are intimately involved in the development of their child's IEP.

*See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. §

1414(d)(1)(B))[18] (Parents play "a significant role in the IEP process" and are "included as

members of 'IEP teams'").  As the Supreme Court has stated:

> The IEP proceedings entitle parents to participate not only in the implementation of
> IDEA's procedures but also in the substantive formulation of their child's educational
> program. Among other things, IDEA requires the IEP Team, which includes the parents
> as members, to take into account any "concerns" parents have "for enhancing the
> education of their child" when it formulates the IEP.

*Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 530 (2007) (internal citations omitted).

Moreover these "procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205.

Importantly, the Supreme Court has stated that "[i]t seems to us no exaggeration to say that

Congress placed every bit as much emphasis upon compliance with procedures giving parents

and guardians a large measure of participation at every stage of the administrative process,

see, *e.g.*, §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a

substantive standard." *Id.* at 205-06. In sum, "there must be a process of written notice, parent

consent, evaluation, creation and review of documents, and development of an IEP in

---

[16] "Each local educational agency or State educational agency shall ensure that the parents of each child
with a disability are members of any group that makes decisions on the educational placement of their
child." 20 U.S.C. § 1414(e).

[17] "The parents of a child with a disability must be afforded an opportunity to participate in meetings with
respect to . . . [t]he identification, evaluation, and educational placement of the child; and (ii) [t]he
provision of FAPE to the child." 34 C.F.R. § 300.501(b).

[18] "The term 'individualized education program team' or 'IEP Team' means a group of individuals"
which includes "the parents of a child with a disability . . . ." 20 U.S.C. § 1414(d)(1)(B).

conjunction with school staff and parents, all of which is known as the 'IEP process.'" *T.R. v. Sch. Dist. of Philadelphia*, No. CV 15-4782, 2019 WL 1745737, at *1 (E.D. Pa. Apr. 18, 2019).

      C.   <u>Claims under the IDEA Alleging Denial of FAPE</u>

"The IDEA establishes a private cause of action against a school district that fails to abide by its legal obligations. The parent or guardian of a minor student who is denied the rights and procedures set forth in the IDEA is afforded the opportunity to file an administrative complaint and to appeal an adverse determination to a federal district court." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010) (citing §§ 1415(b)(6), (i)(2)).

The Supreme Court has directed that a school district's liability for such violations is a two-fold inquiry: "(1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?" *Id.* (quoting *Rowley,* 458 U.S. at 206–07). "While a failure to satisfy either requirement may merit court-ordered relief . . . [a] procedural violation of the IDEA is not a per se denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents." *Id.* (internal quotation omitted). Put another way, "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of

educational benefits." *D.S*, 602 F.3d at 565 (citing C.F.R. 300.513(a)(2));[19] *see* 20 U.S.C. 1415(f)(3)(E)(ii).[20]

The Hearing Officer concluded that although the program offered to A.F. was substantively adequate, procedural violations seriously deprived Parents of their participation rights. Thus, the MCIU's failure to communicate how A.F.'s behavioral issues would be addressed constituted a denial of FAPE. That denial required his parents to incur the expense of private tuition when they concluded that his needs would not be met by the school district. I agree that procedural violations seriously deprived Parents of their participation rights; however, I also conclude that the program offered was substantively inadequate, as will be discussed more fully below.

### D. Analysis of the IEP as of the time it was proposed

In determining whether the school district has fulfilled its obligation to provide the child with a FAPE, the Third Circuit has instructed that "a court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the

---

[19] The IDEA's implementing regulations provide as follows:

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies—
>
> (i) Impeded the child's right to a FAPE;
>
> (ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or
>
> (iii) Caused a deprivation of educational benefit.

34 C.F.R. § 300.513(b).

[20] The aforementioned regulations re-state the statutory language of this subsection of the IDEA. *See* 20 U.S.C. 1415(f)(3)(E)(ii).

time that they were made." *D.S.*, 602 F.3d at 564–65; *see Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993); *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 530 (3d Cir.1995).

As will be discussed below, I have concerns about the extent to which the Hearing Officer relied on testimony to fill in gaps in what the parents were told.

### E.   Tuition Reimbursement under the IDEA

Tuition reimbursement is a recognized remedy under the IDEA. *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (tuition reimbursement is appropriate when a federal court concludes both that the public placement violated IDEA and that the private school placement was proper);  *Sch. Comm. of Burlington v. Dept. of Educ. of Mass.*, 471 U.S. 359, 369 (1985) (courts may order school authorities to reimburse parents the cost of private education under the IDEA).  In determining whether to award full tuition reimbursement under the standard provided by the Supreme Court, I must not only find that there was a denial of FAPE, but also that the Parents' chosen program for which they seek tuition reimbursement was appropriate. *Id.*, 471 U.S. at 369.  Finally, I must consider the equities, including the conduct of the parents and the cost of the tuition at the Private School. *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2496 (2009) ("When a court or hearing officer concludes that a school district failed to provide a FAPE and the private placement was suitable," it must then consider the equities "in determining whether reimbursement for some or all of the cost of the child's private education is warranted.").

 Because neither party is challenging the findings of the Hearing Officer that the private placement selected by the Parents was appropriate and that there was no evidence to support a reduction of reimbursement based upon equitable considerations, the major focus of my inquiry is on the first question—whether there was a denial of FAPE. Pl.'s Mot. for Summ. J. 9; HO Op.

16

27-28.  If I find that requirement satisfied, then full tuition reimbursement to the Parents is a

potential remedy. *Carter*, 510 U.S. 7, 15-16 (citing 20 U.S.C. § 1415(e)(2)) ("once a court holds

that the public placement violated IDEA, it is authorized to 'grant such relief as the court

determines is appropriate.'").

    **IV.**    **Discussion**

        A.  <u>Procedural Inadequacy during the IEP Process</u>

The Hearing Officer found that the MCIU fell "far short of adequately describing the

program and allaying Parents' concerns with what appeared to be a plan with no BCBA support

and little if any intensive ABA-driven services."  HO Op. 26.  However, she did not make

explicit which provision of the IDEA had been violated.  Parents argue that the MCIU committed

several procedural violations of the IDEA: by failing to provide adequate information about

programming and services during the IEP process, by failing to ensure that the appropriate

specialists were present at IEP meetings, and by predetermining the nature of the IEP without

allowing parental input. Defs.' Mot. for Summ. J. 8.  They argue that they were therefore

deprived of their statutory right to meaningfully participate in the development of their child's

education. *Id.*  I agree with the Hearing Officer's ultimate conclusion that the MCIU committed a

procedural violation of the IDEA for the reasons set forth below.

An IEP must include the services designed to meet the child's goals in the provision of

FAPE. *D.S*, 602 F.3d at 557; *see* 20 U.S.C. § 1414(d)(1)(A).  Specifically, it must include "a

statement of special education and related services . . .  to be provided to the child." 20 U.S.C. §

1414(d)(1)(A)(IV).  Department of Education regulations define "related services" to include

"psychological services." 34 C.F.R. § 300.34(a).  "Psychological services include[] . . .

obtaining, integrating, and interpreting information about child behavior and conditions related

to learning," as well as "assisting in developing positive behavioral intervention strategies." 34 C.F.R. §§ 300.34(c)(10)(iii), (vi).

Although "the content of the IEP *as such* does not implicate the IEP's procedural requirements for content is concerned with the IEP's substance" (emphasis added), *D.S*, 602 F.3d at 565, the lack of content in an IEP as it relates to the notice parents receive about their child's proposed education does implicate those requirements. *See* 20 U.S.C. § 1414(e) ("Each local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child."); *Zakary M. by Donna M. v. Chester Cty. Intermediate Unit*, No. 95-CV-1842, 1995 WL 739708, at *3-4 (E.D. Pa. Dec. 6, 1995) (inadequate written notice of the description of the program and placement in the IEP and related documents constituted a procedural violation of the IDEA); *see also R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 194 (2d Cir. 2012) (concluding that IEP was procedurally inadequate, in part, due to school district's failure to include statutorily mandated speech and language therapy in IEP); *N.S. ex rel. Stein v. D.C.,* 709 F. Supp. 2d 57, 72–73 (D.D.C. 2010) (awarding tuition reimbursement where IEP providing "incomplete picture" caused parents to enroll in private school); *cf. M.R.,* 680 F.3d at 274 (evaluating IEP content as it relates to IDEA procedural requirements); *In P.C. ex rel. J.C. v. Harding Twp. Bd. of Educ.*, No. CIV. 2:11-06443 WJM, 2013 WL 3938969, at *9 n.1 (D.N.J. July 31, 2013) (acknowledging that lack of specificity about services could be a procedural violation of the IDEA but ultimately finding that circumstances did not significantly deprive parents of their participation rights).

To review, there were three separate versions of A.F.'s IEP: April, May, and August, 2018.  The initial April 2018 IEP clearly describes "Behavior Support" as one of a portfolio of

"early intervention services" that A.F. was to receive, alongside Occupational Therapy, Physical Therapy, Speech Therapy, and Specialized Instruction. S20.  Again, each of these subcategories fell under the larger category of "early intervention services" within the IEP's internal framework. S20.  In the revised May and August IEPs, however, "Behavior Support" was removed, while the rest of the services remained. S20; S23; S30; S32.

In addition to the fact that the original IEP, prepared by MCIU staff, clearly included Behavior Support as a service that A.F. was to receive, the plain language of the IDEA supports the conclusion that such a service, to the extent that it was still being offered, ought to have remained in the May and August 2018 IEPs. 20 U.S.C. § 1414(d)(1)(A)(IV).  The IEP must include a "statement of special education and related services to be provided . . . to the child." *Id.* The regulations clearly state that "assisting in developing positive behavioral intervention strategies" belong in "a statement of . . . related services." 34 C.F.R. § 300.34(c)(10)(vi). 300.320(a)(3)(i). Similarly, "obtaining, integrating, and interpreting information about child behavior and conditions related to learning" is information regarding services that belongs in an IEP. 34 C.F.R. § 300.34(c)(10)(vi).

The absence of behavioral support in the May and August 2018 IEPs stands in stark contrast to the original version. At the hearing, the MCIU went to great lengths to explain how the services it would have provided would, in fact, have dealt with the child's behavioral needs and would have been consistent with ABA principles.[21]  This does not address the procedural

---

[21] MCIU witnesses described a classroom which was overseen behavioral specialists, including a BCBA and BSC, which included intensive behavioral interventions, which relied on ABA principles, and which involved bi-annual testing through the VB-MAPP, the results of which informed future programming for each individual student. N.T. 302, 450, 467-77, 481, 483, 512, 618, 688, 690, 702-03, 814, 821-22; 830-33, 835; HO Op. ¶ 45-54.

MCIU witness Jacqueline Santolupo discusses how the classroom uses bi-annual testing through the VB-MAPP and how the results of such testing inform ongoing programming. She states:  "[I[t's extremely

deficits identified by the Hearing Officer within the IEP itself.  In fact, this testimony underscores that Parents were correct as to their concerns that behavior needed to be an explicit and central focus of the plan. I share the Hearing Officer's concern that such critical information was deleted from the later versions of the plan that Parents were asked to accept as adequate for their son.

Finally, there is no record evidence that the deletion of Behavior Support as an "early intervention service" and the removal of the BSC from the April 2018 IEP was ever explained to Parents, as members of the IEP Team, despite the fact that the MCIU was aware of Parents' focus on obtaining intensive ABA programming for their child. HO Op. 26; N.T. 128; S21 at 3. Tellingly, Parents could not remember any discussion with the MCIU regarding whether a behavioral specialist would supervise the classroom, nor were they told about early intensive behavioral interventions. N.T. 231  Moreover, the MCIU provided the wrong information in response to Parents' query about whether and to what extent staff were trained in ABA, vastly understating the expertise within the classroom. P1 at 1.  Apparently, MCIU staff felt that it should have been sufficiently obvious to Parents that their child would receive behavioral support at the MCIU classroom. NT 123-125. The MCIU cites a small portion of the mother's testimony to suggest that more information might have been communicated that she simply

---

important when you are programming from the VB-MAPP to understand how to use it, not only as an assessment tool, but also how to program through it, which is why you would typically have a consultant overseeing a verbal behavior program." N.T. 832. "[E]ach student is assessed on the VB-MAPP, and a program is individualized by how they've assessed." N.T. 835.  Similarly,  MCIU witness Sean Romano speaks to the interplay between the methods used in the classroom, the ongoing data collection, the measurement of progress through the VB-MAPP, and the role of the BCBA. He states that the classroom uses  "intensive teaching methods . . . along with data collection procedures that would help the treating BCBA to fill out the VB-MAPP to measure progress." N.T. 703. The VB-MAPP is used "as the guiding principle for the types of programs they're working on." N.T. 703.

cannot recall, Pl.'s Mot. for Summ. J. 7, but this selective focus ignores the overall import of her testimony and the other evidence in the record.

Given the dictates of the statute and pursuant regulations which require "a statement of special education and related services to be provided . . . to the child," the failure to include behavioral support and behavioral specialists in the May and August IEPs in this instance constitutes a procedural violation of the IDEA.[22]  On this record, I cannot say that the Hearing Officer erred in concluding that A.F.'s Parents were simply not on notice about the services that MCIU witnesses later contended were being offered to their child. And despite having multiple opportunities to cure these omissions, the MCIU failed to do so.  *See Zakary M.*, 1995 WL 739708, at \*3-4 (inadequate written notice of the description of the program and placement in the IEP and related documents constituted a procedural violation of the IDEA); *see also R.E.*, 694 F.3d at 194 (concluding that IEP was procedurally inadequate, in part, due to school district's failure to include statutorily mandated speech and language therapy in IEP); *N.S. ex rel. Stein.,* 709 F.Supp. 2d at 72–73 (awarding tuition reimbursement where IEP providing "incomplete picture" caused parents to enroll in private school).

---

[22] I reject Parents' other two arguments regarding procedural violations of the IDEA: (1) that the MCIU violated the IDEA by failing to include the proper individuals at the April 2018 IEP meeting, and (2) that the MCIU's IEP was predetermined and therefore parental input was not properly considered.

With regard to the lack of attendance at the meeting by a behavioral specialist, the Hearing Officer did not explicitly find that the IDEA had been violated. Instead, the Hearing Officer appropriately considered the lack of attendance of a behavioral specialist at IEP meetings as evidentiary support for Parents' proposition that they did not understand the program that MCIU had set forth.

With regard to the allegation that the IEP was predetermined, it is clear that the MCIU revised the IEP following an April IEP meeting with Parents and increased levels of speech and occupational therapy as Parents had requested. N.T. 123-24, 515, 554, 622; S-23; HO Op. ¶ 36. Thus, I cannot say that Parents were "merely present" at the IEP meetings without participating. *Compare D.B. ex rel. H.B.*, 751 F. Supp. 2d at 772 (finding that IEP was predetermined where school district failed to incorporate any suggestions of the parents) *with Fuhrmann*, *993* F.2d at 1036 (finding parents had the opportunity to participate in IEP formulation in meaningful way).

B. <u>MCIU's procedural violation significantly impeded Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to their child.</u>

According to the Hearing Officer, the lack of adequate communication was a "fatal flaw" that  prevented Parents from making an "informed decision" about moving forward with the program that was offered, thus significantly denying Parents' participation in the development of their child's education. HO Op. 26.  After a full examination of the record, and giving due weight to the Hearing Officer's findings, I agree.

As stated above, the IEP must include the services designed to meet the child's goals. *See D.*S, 602 F.3d at 557; 20 U.S.C. § 1414(D)(1)(A). And, as the Hearing Officer found, the Parents—as IEP team members—"had made clear their interest, and even insistence, on programming with intensive ABA support." HO Op. 26.  It bears repeating that although "the content of the IEP *as such* does not implicate the IEP's procedural requirements for content is concerned with the IEP's substance" (emphasis added), *D.S.*, 602 F.3d at 565, a lack of content in an IEP as it relates to the parents' ability to meaningfully participate does implicate those requirements.  What makes procedural compliance significant is its "impact on students' and parents' substantive rights." *Id.*   Or, as formulated by the Supreme Court in *Rowley,* "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at *every stage of the administrative process*, see, *e.g.*, §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a substantive standard." 458 U.S. at 189 (emphasis added); *accord Zakary M.*, 1995 WL 739708, at *3-4 (inadequate written notice of the description of the program and placement in the IEP and related documents was sufficient for an award of tuition reimbursement to parents); *see R.E.*, 694 F.3d at 194 (concluding that IEP was procedurally inadequate, in part, due to school district's failure to

include statutorily mandated speech and language therapy in IEP); *cf. M.R.,* 680 F.3d at 274 (evaluating content of IEP as it relates to IDEA procedural requirements).

Parents, as IEP team members, must be "allowed to meaningfully participate in the [IEP] drafting process." *D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F.Supp. 2d 764, 776 n.15 (D.N.J. 2010*), aff'd sub nom. D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564 (3d Cir. 2012). And as the general body of case law within the Third Circuit instructs, "meaningful participation is assessed on an individual basis." *T.R.*, 2019 WL 1745737, at *16 (collecting cases). As a practical matter, meaningful participation requires a reasonable degree of understanding to allow parents to make an informed decision about their child's education. *See Zakary M.*, 1995 WL 739708, at *3-4; *see also R.E.*, 694 F.3d at 194; *N.S. ex rel. Stein.,* 709 F.Supp. 2d at 72–73; *cf. M.R.,* 680 F.3d at 274.

Admittedly, the IDEA guarantees an appropriate—not an optimal—education for disabled students. *M.R.*, 680 F.3d at 269. That said, without clear communication from the MCIU regarding the services they wished to offer, there was simply no way for Parents to determine whether the education offered was actually appropriate.

In determining whether Parents were denied meaningful participation in the IEP process, the Third Circuit has held that information contained in NOREP letters can supplement the information missing from an IEP regarding services that a child will receive. *See M.R.*, 680 F.3d at 274-75. Yet the facts before me are materially different from those considered in *M.R.* There, the Third Circuit found that NOREP letters containing specific information that had been left out of an IEP were sufficiently curative; the lack of information in the IEP thus did not significantly impede parents from participating meaningfully in the process. *M.R.*, 680 F.3d at 275. Significantly, those NOREP letters included information pertaining to both the programming the

child would receive and the amount of time that would be devoted to such programming. *Id.* at 274-75.  Most importantly, the parents in *M.R.* "were intimately involved in the process of crafting E.R.'s IEP and *d[id] not contend that they were unaware of the services E.R. was scheduled to receive*" (emphasis added). *Id.*

In contrast, in this case it was Parents' specific complaint that they were deprived of essential information regarding their son's education. Defs.' Mot. for J. on the Admin. R. 8-9. Parents argue that they were provided "virtually no information about the proposed program: they did not know and could not have known what programming and services A.F. would actually receive." Defs.' Mot. for J. on the Admin. R. 9.  Giving due weight to the Hearing Officer's findings about the lack of information that was provided to Parents, Parents' lack of understanding of the program, and their resulting inability to make an "informed decision" with regard to their child's education, I find no reason to depart from those findings.[23]

Moreover, the NOREP letters that were held to be sufficiently curative in *M.R.* provided a level of detail not seen in the NOREP letters at issue here.  Those letters included not just the programming but the amount of time that would be devoted to such programming. *M.R.*, 680 F.3d at 274-75.  That distinction is especially significant given that the April 2018 IEP had included a ninety minute/week dosage of "Behavior Support," as well as the involvement of a behavioral specialist, information that was stricken from the later IEPs. HO Op. ¶¶ 33, 36; S20;

---

[23] These factual findings appear both in the section of the Hearing Officer's Opinion entitled "Findings of Fact," HO Op. ¶ 38, as well as in the Section entitled "Discussion and Conclusions of Law." Regardless of where the Hearing Officer's factual findings appear in the Opinion, they are entitled to "due weight" as factual findings.  For example, although the Hearing Officer included in the "Discussion" section of her Opinion findings that circumstances deprived Parents of the ability to make an informed decision, and that their lack of understanding came about through no fault of their own, those are both clear statements of fact, which ultimately support the Hearing Officer's conclusion of law that Parents were significantly deprived their participation rights under the IDEA.

S23; S30; S32.  Therefore, I agree with the Hearing Officer's finding that the mention of an

"ABA Classroom" in the NOREP letters here constitutes nothing more than a "mere reference . .

. in passing." HO Op. 26.  The MCIU's NOREP letters did not go far enough to cure the

procedural violation and thus afford Parents an opportunity to participate meaningfully.[24]

The MCIU is correct that courts within this Circuit have found that "meaningful

participation" cannot require "perfect comprehension" of an IEP by parents. *Colonial Sch. Dist.*

*v. G.K. by & through A.K.*, 763 F. App'x 192, 198 (3d Cir. 2019). They cite a number of

decisions to support that proposition. *See id.*; *In P.C. ex rel. J.C.*, 2013 WL 3938969, at *9 n.1;

*W.R. v. Union Beach Bd. of Educ.*, 414 F. App'x 499, 501 (3d Cir. 2011); *Allyson B. ex rel.*

*Susan B. v. Montgomery Cty. Intermediate Unit No. 23*, No. CIV.A.07-2798, 2010 WL 1255925,

at *11 (E.D. Pa. Mar. 31, 2010), *aff'd sub nom. A.B. ex rel. Susan B. v. Montgomery Cty.*

*Intermediate Unit,* 409 F. App'x 602 (3d Cir. 2011).

But the Defendants are equally correct in observing that those cases nonetheless support

the rule that parents are entitled to enough specific information to form a reasonable picture of

the program proposed for their child. In each case, the court found that parents were not

significantly deprived of their participation rights because they had enough information to make

an informed decision about their child's education.  Here, however, the Hearing Officer

specifically found the opposite: that Parents did not have enough information "to make an

informed decision" with respect to the program that MCIU had offered to their son. HO Op. 26.

That is because "[t]he IU did not explain how Child's programming would be individualized for

Child, would address Child's significant language deficits, or would be based on ABA

---

[24] For the same reasons, the August 7, 2018 email sent to Parents by the MCIU is also inadequate. P1 at 5.

principles." HO Op. ¶ 38. *See T.R.*, 2019 WL 1745737, at *16 (E.D. Pa. Apr. 18, 2019)

("meaningful participation is assessed on an individual basis").

 None of these cases is binding, but because the MCIU relies heavily upon them, I will

consider each in turn.

 *In P.C. ex rel. J.C..*, where parents sought tuition reimbursement because an IEP was not

sufficiently specific about services their child would receive, the court ultimately held for the

school district, in part because the parents had hired a BCBA consultant to observe the proposed

program prior to electing to send their child to a private school. 2013 WL 3938969, at *3, 9 n.1.

Here, A.F.'s mother visited the program on her own and cannot be faulted for being unable to

glean from her observations information that was excluded from the revised IEPs.[25] N.T. 236,

265-66.  In fact, after her visit, when she attempted to follow up with the MCIU about the

qualifications of classroom staff with regard to ABA training, the MCIU failed to alert her that

behavioral specialists would in fact be overseeing the classroom, but instead informed her only

about the presence of personal care aides. P1-1.

 Similarly, in *W.R. v. Union Beach Bd. of Educ.*, the court ultimately affirmed the District

Court's finding against the parents because "the parents and the District . . . [had] communicated

extensively about the details of [child's] reading program before the first due process petition

was ever filed." 414 F. App'x at 501. The court found that the facts as articulated by the ALJ

evinced a "considerable back and forth" between the parents and the school district and that the

District "had communicated the methodology it sought to implement through the IEP." 414 F.

App'x at 501. Here, the Hearing Officer found that '[t]he IU did not explain how Child's

programming would be individualized for Child, would address Child's significant language

---

[25] A.F.'s mother, though a child psychologist, specializes in school aged children, as opposed to pre-school, and has no formal training in ABA, nor does she specialize in it. N.T. 202, 219.

deficits, or would be based on ABA principles." HO Op. ¶ 38.  Moreover, specific reference to behavioral support that was found in the original IEP had been inexplicably removed. HO Op. ¶ 36.  As stated above, I cannot say that the Hearing Officer erred in her conclusion that the MCIU failed adequately to communicate the methodology it sought to implement. *See* HO Op. ¶ 38.

In *Allyson B. ex rel. Susan B. v. Montgomery Cty. Intermediate Unit No. 23*, the Court was persuaded that the IEP's failure to include a complete description of the child's curriculum—and specifically a program known as AUSPLAN that would be targeted to the child –-did not prevent the parents from adequately evaluating the placement. 2010 WL 1255925, at *11.  The Court found it material that several other curricula were provided and that the parents were provided a description of the daily activity of the classroom. *Id.* at *11.  Significantly, the district court's opinion does not suggest that the parents had had conveyed any specific interest in AUSPLAN to the MCIU in developing the IEP, as was the case with Parents here, who had "made clear their interest" in an intensive ABA program. HO Op. 26; HO Op. ¶ 35.  Moreover, the AUSPLAN curriculum in *Allyson B.* had not appeared in an earlier IEP only to be later removed without explanation. On the record here, there was a basis for the Hearing Officer to conclude that the elimination of "Behavior Support" as one of the portfolio of services provided through the IEP, along with the removal of the BSC, was far more significant, affecting "informed" decision-making by A.F.'s Parents. HO Op. 26.

Finally, in *Colonial Sch. Dist. v. G.K. by & through A.K.*, the Court found that the evidence did not support a conclusion that parents "failed to "comprehend the IEP or found it confusing in any respect." 2018 WL 2010915, at *14.  Rather, the record supported a conclusion that parents actually did in fact understand the IEP but objected because they held  "an affirmative belief" that it was substantively inadequate. *Id.* at *13.  Here, after a four-day

hearing, and considering the fact that Parents could not make an informed decision—and through no fault of their own, HO Op. 26, the Hearing Officer concluded that MCIU communications fell "far short of adequately describing the program" and thus significantly deprived Parents of their participation rights. HO Op. 26; *see* HO Op. ¶ 38.

Ultimately, granting due weight to the factual findings of the Hearing Officer, I find that the preponderance of the evidence shows that Parents were significantly impeded from meaningful participation in the IEP process.  Thus, the Hearing Officer did not err in concluding that A.F. was denied a FAPE on these grounds. Despite the Parents' clearly stated priorities, "[t]he IU did not explain how Child's programming would be individualized for Child, would address Child's significant language deficits, or would be based on ABA principles." HO Op. ¶ 38.  The MCIU has failed to provide sufficient evidence to justify departing from those findings.[26]  In sum, I find it difficult to imagine how Parents could meaningfully participate in the creation of an IEP when, on the one hand, the school district states that it is addressing their concerns while, on the other, removing explicit references within the IEP to the very services about which Parents have expressed they care most deeply— HO Op. ¶ 38—and then failing to explain those changes. *See Zakary M.*, 1995 WL 739708, at *3-4 (inadequate written notice of the description of the program and placement in the IEP and related documents was sufficient for an award of tuition reimbursement to parents); *D.B. ex rel. H.B.*, 751 F.Supp. 2d at 772 (finding

---

[26] The Hearing Officer's findings are further supported by evidence on the record that MCIU staff felt that the presence of behavioral programming should have been sufficiently obvious simply because the proposed placement was described as an "ABA Classroom" in various communications outside of the IEPs, N.T. 123-25, as well as evidence that staff were instructed not to update the IEP in advance of the final IEP meeting. P25 at 4.  According to Program Administrator Lorinda Moyer, Parents' "conversation always went right to services, and I kept trying to prompt to go back to the goals and the needs . . . ." N.T. 128.

violation of parents' participation rights under the IDEA due, in part, to failure to incorporate parents' suggestions in an IEP or discuss with parents their child's prospective placement); *see also R.E.*, 694 F.3d at 194 (concluding that IEP was procedurally inadequate, in part, due to school district's failure to include statutorily mandated speech and language therapy in IEP); *N.S. ex rel. Stein.,* 709 F.Supp. 2d at 72–73 (awarding tuition reimbursement where IEP providing "incomplete picture" caused parents to enroll in private school).

   C.   <u>Substantive Inadequacy of the revised IEPs</u>

  Parents have put forward several arguments in seeking to overturn the Hearing Officer's conclusion that the program offered by the MCIU was substantively appropriate, including that the Hearing Officer erred by considering testimony that materially altered the written IEPs. I agree with Parents that the Hearing Officer erred by giving too much weight to such testimony. That alone is sufficient to reject the Hearing Officer's conclusion about the substantive appropriateness of the program that was offered to A.F.[27]

  As set forth above, the Third Circuit has held that an IEP must be evaluated by its appropriateness at the time it was proposed. *D.S.*, 602 F.3d at 564–65; *Fuhrmann* 993 F.2d at 1040; *Scott P.,* 62 F.3d at 530. In *R.E. v. New York City Dep't of Educ.*, the Second Circuit cited this line of Third Circuit cases when it decided whether and to what extent to consider retrospective testimony—"*i.e.,* testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed

---

[27] I reject the alternative bases that Parents have proffered to support a finding that the program offered by the MCIU was substantively inadequate. *See, e.g.,* Defs.' Mot. for J. on the Admin. R. 21, 28. Each would require overturning the Hearing Officer's findings regarding the relative credibility of the witnesses—including that of Parents' expert—when it comes to describing a program that would have been appropriate for A.F. HO Op. 17-18. I am not convinced that the non-testimonial, extrinsic evidence justifies any such departure from the Hearing Officer's credibility determinations as to these issues. *See D.S.*, 602 F.3d at 564.

placement"—in evaluating the appropriateness of an IEP. 694 F.3d at 187.  It concluded that a

Hearing Officer ought not consider retrospective testimony that "materially alters the written

IEP" in determining whether the school district offered a FAPE to the child. *Id.*

A number of district courts in this Circuit have found *R.E.* persuasive. *See,*

*e.g., Norristown Area Sch. Dist. v. Frank, No.* CV 13-5612, 2014 WL 11370484, at *10 (E.D.

Pa. June 18, 2014), *aff'd sub nom. Norristown Area Sch. Dist. v. F.C.*, 636 F. App'x 857 (3d Cir.

2016) ("we restrict our analysis to the IEP itself rather than predicting what services the District

would have actually provided"); *Jalen Z. v. Sch. Dist. of Philadelphia*, 104 F. Supp. 3d 660, 676–

77 (E.D. Pa. 2015) (allowing retrospective testimony only to the extent that it provided a "more

complete picture of the program"); *T.E. v. Cumberland Valley Sch. Dist.,* No. 13–643, 2014 WL

47340, at *3 (M.D.Pa. Jan. 7, 2014) (applying *R.E.* in affirming the Hearing Officer's decision).

I also find some value in the reasoning of *R.E.*, especially given its reliance on binding

Third Circuit precedent. *See R.E.*, 694 F.3d at 187 (citing *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d

553, 564-65 (3d Cir. 2010), *Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ.*, 993

F.2d 1031, 1040 (3d Cir. 1993), and *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 530 (3d

Cir.1995)); *see also Norristown Area Sch. Dist.*, 2014 WL 11370484, at *10 (citing *R.E.* and

restricting its "analysis to the IEP itself rather than predicting what services the District would

have actually provided"); *Jalen Z.*, 104 F. Supp. 3d 660, 676–77 (allowing retrospective

testimony only to the extent that it provided a "more complete picture of the program" per the

reasoning laid out in *R.E.*); *T.E.,* 2014 WL 47340, at *3 (applying *R.E.* in affirming the Hearing

Officer's decision); *cf. G.A. ex rel. L.A. v. River Vale Bd. of Educ.*, No. CIV.A. 11-3801 FSH,

2013 WL 5305230, at *25 (D.N.J. Sept. 18, 2013) ("Nevertheless, if the IEP is vague about how

a goal shall be achieved, the court may examine extrinsic evidence to determine the intent of

those who formulated the program"). Thus, I will not consider retrospective testimony that "materially alters the written IEP" in determining whether the school district offered a FAPE to the child. *R.E.*, 694 F.3d at 187.

Explicit reference to behavioral services were removed from the May and August 2018 IEPs, despite Parents' repeated requests for intensive ABA programming. HO Op. 26. Over a four-day hearing, MCIU witnesses testified not only that behavioral services were necessary, but that they *would* have been provided had A.F.'s Parents accepted the May and August IEPs.[28]  To rationalize this discrepancy, MCIU witness and BCBA Sean Romano testified that behavioral intervention "is not specifically listed . . . because it is built into every autism classroom." N.T. 690.

In *R.E.*, the court was presented with the question of the extent to which it should consider "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement" when evaluating the appropriateness of an IEP. 694 F.3d at 185.  The Second Circuit concluded that testimony that "materially alters the written IEP" ought not to be considered, while testimony that "explains or justifies the services listed in the IEP" is appropriate for consideration. *Id.* (citing *D.S.* 602 F.3d at 564-65)*; see Scott P.,* 62 F.3d at 530 (holding that an IEP must be judged prospectively from the time of its drafting). The Court also provided helpful examples of certain kinds of information that would constitute such a material alteration to an IEP:

> If an IEP states that a specific teaching method will be used to instruct a student, the school district may introduce testimony at the subsequent hearing to describe that teaching method and explain why it was appropriate for the student. The district,

---

[28] For example, MCIU witnesses Moyer testified that A.F. "definitely demonstrated behavioral needs that needed to be addressed," that, accordingly, "we were providing behavior services," and finally that these services consisted of verbal behavior programing. N.T. 123.

> however, may not introduce testimony that a different teaching method, not mentioned in the IEP, would have [] been used. Similarly, if a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate. It may not introduce evidence that modifies this staffing ratio . . . .

*R.E.*, 694 F.3d at 186–87. It elaborates further:

> The prospective nature of the IEP . . . forecloses the school district from relying on evidence that a child would have had a specific teacher or specific aide. At the time the parents must decide whether to make a unilateral placement based on the IEP, they may have no guarantee of any particular teacher. Indeed, even the Department cannot guarantee that a particular teacher or aide will not quit or become otherwise unavailable for the upcoming school year. Thus, it is error to find that a FAPE was provided because a specific teacher would have been assigned or because of actions that specific teacher would have taken beyond what was listed in the IEP. The appropriate inquiry is into the nature of the program actually offered in the written plan.

*Id*. at 187.

In citing *R.E.* I do not view it as establishing a standard different from the Third Circuit cases that it cites. Rather, I view is as helpful to applying the Third Circuit standard where a matter of central concern is omitted from the IEP, and the gap can only be cured by after-the-fact testimony. That is not to say that the parole evidence rule should apply, but that testimony must serve the purpose of explaining what is in the IEP, and not constitute revision.

The Hearing Officer, to the extent that she found a substantive FAPE had been offered, relied on testimony that the classroom would have included "significant BCBA involvement" and the administration of a VB-MAPP test twice per year to guide programming decisions. HO Op. 26. For example, the Hearing Officer found that "a Board-Certified Behavior Analyst (BCBA) and a behavioral specialist consultant also spent several hours in the classroom each week, overseeing the classroom." HO Op. ¶ 45. She also found that "the classroom assessed students using the Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP) on which instruction was based in order for the children to learn skill sets." HO Op. ¶ 47. But such information provided by the MCIU witnesses can be found nowhere in the IEP.

The testimony that led to these findings materially alters the written IEP. Behavioral Specialists like BCBAs and BSCs, who were omitted from the May and August IEPs, would have taken actions "beyond what was listed in the IEP." *R.E.*, 694 F.3d at 187. Those staff are clearly critical to the overall functioning of the classroom: they not only oversee and train the other staff in verbal behavior and behavioral analysis, but also administer individual testing to each child via the VB-MAPP, tailoring each child's education to the results of such tests. NT 703, 822, 832, 835. The behavioral specialists "work[] together with the treatment team" and would be involved in the treatment of each individual child. Moreover, verbal behavior is not simply a methodology utilized at the classroom, N.T. 830-31, but "the guiding principle." N.T. 703. That the MCIU needed to provide four days of testimony that the classroom provided "built in behavioral support" is in itself evidence that such critical information needed to be in the IEP. N.T. 688. As the Supreme Court has stated, "[t]he IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Endrew*, 137 S. Ct. at 999.

In sum, I am persuaded by both the April 2018 IEP and the testimony of several MCIU witnesses that in order to receive a FAPE, A.F. required behavioral support and the involvement of a behavioral specialist. Explicit reference to these services was nevertheless deleted from the revised IEPs. Testimony that such services would have been provided therefore constitutes a material alteration of the IEPs. *See R.E.,* 694 F.3d 167, 187 (citing *D.S.*, 602 F.3d at 564–65, *Fuhrmann*, 993 F.2d at 1040, and *Scott P.*, 62 F.3d at 530; *see also Norristown Area Sch. Dist.*, 2014 WL 11370484, at *10 (citing *R.E.* and restricting its "analysis to the IEP itself rather than predicting what services the District would have actually provided"). Therefore, I find that the Hearing Officer erred to the extent that she relied on such testimony in determining that the

MCIU had offered a substantive FAPE.[29]  Having failed to include critical information about behavioral services in the IEP, the program offered by the MCIU was substantively inadequate and failed to offer a FAPE to A.F.

I will therefore deny MCIU's Motion for Summary Judgment/Judgment on the Administrative Record to the extent that it seeks to overrule the Hearing Officer's decision regarding a denial of FAPE on procedural grounds, as well as to the extent that it seeks to affirm the Hearing Officer's decision that the MCIU's program was substantively appropriate. Correspondingly, I will grant Parents' Motion for Judgment on the Administrative Record as to the denial of FAPE on both procedural and substantive grounds. And I will affirm the Hearing Officer's decision to award tuition reimbursement.[30]  Defendants, as prevailing parties in the administrative proceedings, are also entitled to reasonable attorney's fees and costs to the extent that Defendants make a proper motion before this Court for such fees.[31]

## V.      Section 504 and Americans with Disabilities Act ("ADA") Claims

---

[29] Since "[t]he issue of whether an IEP is appropriate is a question of fact," I note that the nontestimonial extrinsic evidence—the revised IEPs themselves—, along with the Hearing Officer's consideration of testimony that materially altered the revised IEPs, warrants departing from her findings that those IEPs were appropriate for A.F. D.S., 602 F.3d at 564.

[30] The MCIU does not contest the Hearing Officer's finding that equitable considerations do not warrant a reduction of tuition reimbursement, nor her finding that the Private School was appropriate. HO Op. 27; Pl.'s Mot. for Summ. J. 9.  It bears mention that Parents made every effort to engage in the process from start to finish. They initiated the process months early to ensure that services were in place by A.F.'s third birthday. N.T. 203. As stated above, they attended multiple meetings, sent updates to the MCIU from outside service providers regarding A.F.'s progress and needs, toured the MCIU classroom, and diligently initiated follow up communications by email.  I agree with the Hearing Officer that their lack of understanding of the MCIU Classroom came about through no fault of their own. *Cf. C.H.*, 606 F.3d at 70–71 (holding that parents were not denied meaningful participation where parents were "their own greatest impediment . . . to the development of an appropriate IEP").

[31] "Attorneys' fees. (a) In general. (1) In any action or proceeding brought under section 615 of the Act, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to—(i) The prevailing party who is the parent of a child with a disability." 34 C.F.R. § 300.517.

The Hearing Officer addressed the IDEA, Section 504[32], and ADA[33] claims coextensively, and concluded that a denial of FAPE on procedural grounds satisfied the elements of each claim. HO Op. 22, 28.  The MCIU specifically contests Section 504, but does not directly address the ADA, arguing globally that the Hearing Officer's findings were wrong. Because I have rejected the MCIU's arguments as to the Hearing Officer's factual findings, the administrative record supports relief on the Parents' ADA claim.[34]

"[T]he substantive standards for determining liability [under Section 504 and the ADA] are the same." *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995). To establish a violation under Section 504 or the ADA, a plaintiff must show that he or she "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [that] disability." *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). Under Section 504, however, there must be "additional showing that the program receives

---

[32] Section 504 refers to Section 504 of the Rehabilitation Act of 1973. *See* 29 U.S.C. § 794.

[33] *See* 42 U.S.C. § 12101 *et seq.*

[34] The Third Circuit has clearly stated that "[i]n reviewing a dispute brought under the IDEA's administrative process," the "due weight" standard of review applies. *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.,* 585 F.3d 727, 734 (3d Cir. 2009). Judges in this district have generally construed this language to apply to all claims brought through that administrative process, not simply the IDEA claims. *See G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 461 (E.D. Pa. 2011) (applying "due weight" standard to all claims); *cf. M.W. v. Sch. Dist. of Philadelphia*, No. CV 15-5586, 2016 WL 3959073, at *2 (E.D. Pa. July 22, 2016) (noting that it is unclear whether the "due weight" standard to Section 504/ADA claims)*; Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 482 (E.D. Pa. 2011) (noting that "[c]ourts are divided as to whether the 'due weight' standard applies to administrative findings of fact in the Rehabilitation Act context").

federal financial assistance." *Id.* at 198 n.20.  The MCIU does not dispute the first two elements of these claims. Compl. ¶¶ 7-8.[35]

There is a preponderance of the evidence in the administrative record to satisfy the third element in this case since a denial of FAPE is sufficient to demonstrate that a student was excluded from participation in, denied the benefits of, or subject to discrimination at school. *See Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007) ("[W]hen a state fails to provide a disabled child with a free and appropriate education it violates the IDEA. However, it also violates the [Rehabilitation Act] because it is denying a disabled child a guaranteed education merely because of the child's disability."). The Hearing Officer explicitly found, and I have affirmed, that the MCIU denied FAPE to A.F. HO Op. 27-28.  Therefore, Plaintiff satisfies the third and final element of their claim under the ADA.[36] *See McDonald*, 62 F.3d at 95 ("[T]he substantive standards for determining liability [under Section 504 and the ADA] are the same."). Therefore, I will deny the MCIU's  Motion for Summary Judgment/Judgment on the Administrative Record as to the Parents' ADA claim and correspondingly grant the Parents' motion.

---

[35] According to the MCIU, "A.F. is a child with a disability, namely autism, and who, as a result, is in need of special education and related services under the IDEA." Moreover, he "became eligible to receive services for the Montgomery County Intermediate Unit in August of 2018." Compl. ¶¶ 7-8.

[36] The MCIU argues that Parents have not satisfied the elements of Section 504 claims under *Andrew M*. 490 F.3d at 345.  I disagree.  *Andrew M.* specifically distinguished between claims under Part C of the IDEA by parents of children under the age of three, who are not entitled to a FAPE, and those claims brought under Part B by parents of children three and older.  In this matter, Parents' claims clearly arise under Part B. *Andrew M.*, 490 F.3d at 345 ("Section 1415 provides the review process for claims under Part B of the IDEA, which deals with a free and appropriate education . . . ."); Compl. ¶17; Defs.' Answer & Countercl. ¶17, ECF No. 5. The IEPs in this matter were designed for the 2018-2019 school year; A.F.'s education at the MCIU classroom would have begun immediately after his third birthday on August 23, 2018. N.T. 26; 682; S32 at 2, 33. Plaintiff itself has argued that "the special education hearing officer correctly found that the intermediate unit properly evaluated student and offered a FAPE under the IDEA for the 2018-2019 school year." Pl.'s Mot. for Summ. J. 9.

But Section 504 requires an additional element—federal funding. Nothing in the record establishes this element, and Parents have not addressed the issue their briefing. I will therefore not grant Parents relief under Section 504, because they have not proven the claim.

Parents may be entitled to appropriate expert fees to the extent that they make a proper motion before this court for such fees. *See E.H. v. Wissahickon Sch. Dist.*, No. CV 19-5445, 2020 WL 6286709, at *12 (E.D. Pa. Oct. 27, 2020) *(*citing *Lovell v. Chandler*, 303 F.3d 1039, 1058-59 (9th Cir. 2002)) ("expert fees are litigation expenses recoverable under the ADA").

I will leave open the determination of the specific calculation of tuition reimbursement, attorneys fees and costs, and the appropriateness of expert fees for a later hearing.  An Order follows.

_____/s/ Gerald Austin McHugh_____
United States District Judge